119 So.2d 691 (1959)
Gwendolyn HOYT, Appellant,
v.
STATE of Florida, Appellee.
Supreme Court of Florida.
December 2, 1959.
Rehearing Denied April 20, 1960.
*692 C.J. Hardee, Jr., of Hardee & Ott and Carl C. Durrance, Tampa, for appellant.
Richard W. Ervin, Atty. Gen., and George R. Georgieff, Asst. Atty. Gen., for appellee.
DREW, Justice.
Gwendolyn Hoyt was indicted for second-degree murder of her husband Clarence Hoyt. She pleaded not guilty and not guilty by reason of temporary insanity, was tried and a verdict of guilty as charged was rendered by the jury.
The homicide occurred at the parties' home when appellant, after prolonged marital discord and alleged infidelities, called her husband from his military station in *693 another city by a false report of injury to their young son. She was unable to salvage their relationship by any means, and when she was so informed by the deceased in a final and unequivocal fashion at the unfortunate moment when she was disposing of a damaged baseball bat, the fatal blows were struck. Immediate medical attendance could not repair the extensive head injuries which resulted in death the following day. Appellant gave a full account of events, which are not materially in dispute, indictment and trial followed in due course, and this appeal ensued.
By challenge to the all-male jury panel the appellant raised an issue as to the validity or constitutionality of F.S. Section 40.01(1), F.S.A.,[1] insofar as it provides that, while jurors are to be taken from male and female electors, "the name of no female person shall be taken for jury service unless said person has registered with the clerk of the circuit court her desire to be placed on the jury list." The validity of the statute was sustained by the trial court. Jurisdiction of this Court is invoked to review that judgment as one "directly passing upon the validity of a state statute * * * or construing a controlling provision of the Florida or Federal Constitution.[2]
The record reflects that the list of names from which the venire was chosen did contain some names of women who had registered for jury service, and that the number so included was proportionately at least a fair representation of the total number of eligible women registered for jury service. The complaint, therefore, is that the law itself, by imposing upon women a burden (voluntary registration) not imposed upon men as a requirement for being called to jury service, operates to deprive the defendant of the "impartial jury" required by Section 11, Declaration of Rights, Florida Constitution, or of "equal protection of the laws" guaranteed by Amendment XIV, United States Constitution.
Neither contention can be sustained. Courts, under laws making women eligible for jury service, have condemned the exclusion of eligible women from a jury by arbitrary administrative action, noting in this respect that their exclusion "may indeed make the jury less representative of the community than would be true if an economic or racial group were excluded."[3] We find no instance, however, where a court has overruled a legislative determination, or declared invalid a constitutional provision, that women as a class should be subject to different treatment or regulations, such as those here involved, with respect to jury service. The prohibition is against the enactment or application of laws to single out a class for different treatment "not based on some reasonable classification" or basis.[4] All such decisions recognize the fact that "circumstances or chance may well dictate that no persons in a certain class will serve on a particular jury or during some particular period," and that a defendant's only right is to be "tried by juries from which all members of his *694 class are not systematically excluded"  a right to juries fairly selected from among all qualified or eligible persons.[5]
None of the later opinions either expressly or impliedly abandons the early pronouncement that within certain limits the law may prescribe qualifications for jurors "and in so doing make discriminations. It may confine the selection to males, to freeholders, to citizens, to persons within certain ages, or to persons having educational qualifications."[6] Provisions for absolute ineligibility or general exclusion of women from jury service were, of course, the universal rule in the past, grounded historically, we believe, upon the inconsistency of such demands with their role in society.[7]
From the established precedent that women as a class may be excluded altogether from this particular civic labor without depriving a defendant of any constitutional rights, it logically follows that a rule or regulation of their service is not objectionable merely because it may incidentally operate to limit the proportion of women on juries. Even if it be conceded that an impartial jury, or due process of law, includes the concept of a "representative" jury, one is entitled under all the cited cases only to attack provisions which limit unfairly, or without a reasonable basis, his opportunity to obtain such a jury. The statute under consideration does not, in our opinion, make such an arbitrary classification or discrimination.
The same functional rationale mentioned in connection with the former exclusionary rule will sustain a statutory rule, such as our present law,[8] against compulsory service after removal of eligibility barriers. Whatever changes may have taken place in the political or economic status of women in our society, nothing has yet altered the fact of their primary responsibility, as a class, for the daily welfare of the family unit upon which our civilization depends. The statute, in effect, simply recognizes that the traditional exclusion was based not upon inherent disability or incapacity but upon the premise that such demands might place an unwarranted strain upon the social and domestic structure, or result in unwilling participation by those whose conflicting duties, while not amounting to actual hardship, might yet be expected, as a general rule, to affect the quality of their service as jurors. The law vests in the individuals concerned, as those best qualified to judge, the right to decide without compulsion whether such service could be rendered without risk of impairment in their more vital role. There is an obvious distinction between such a legislative classification or rule of privilege and the case of a blanket administrative exclusion of an eligible-class for supposed hardship.[9]
With respect to other objections to the manner in which the jury list was compiled, appellant has failed to show that the requirements of F.S. Chapter 40, F.S.A., were violated in any way. That law contains no positive mandates that selections be made in any particular proportions, and the evidence does not indicate anything resembling a systematic exclusion of eligible registered female electors. Likewise the statute clearly contemplates the use of clerical assistance in the preparation of the list and does not require more than the personal supervision and review exercised by the commissioners in this case.[10]
*695 The assertion is made that the procedure followed in compilation of the jury list amounted to unlawful delegation of the commissioner's discretionary powers and violated certain principles referred to in our decisions. First, "they cannot by subsequently ratifying a selection made by some other person render the selection valid."[11] An investigation of the decisions upon which this text statement is based fails to reveal any case in which a court has disapproved the typing of names by an employee from specified registration lists at the direction of the commissioners, in the circumstances of this case.[12] The evil against which the rule is obviously directed is the choice of names by any "other person" in the character of a volunteer or one having even a potential interest in the procedure. The transcription of names from a specified register under direction of law or order of the commissioners does not, upon any rational theory, amount to "selection" by the transcriber or clerk, but rather the selection is in fact made by the officials directing the procedure and approving the list compiled. Similarly, their action is "in concert" if the certification of the list and the procedure by which it is produced is the result of their combined and cooperative efforts, as opposed to a list "drawn by some of county commissioners in [total] disregard of counsel and advice of others."[13] Certainly the decision first above cited to the effect that a challenge may be based upon participation by parties, other than clerical assistants, who are alleged to be prejudiced to defendant and taking an active part in the prosecution of the cause, is not inconsistent with the conclusion reached in this case.
The appellant further contends that the court erred in denying motion for directed verdict of acquittal upon the medical testimony as to insanity; and in refusing to find upon the evidence that the charge should as a matter of law be reduced to manslaughter. On these issues it will suffice to say that a jury question was, under former decisions of this Court, plainly presented.[14] There was no conflict in respect to appellant's medical history, reflecting affliction with epilepsy from an early age. But, while medical experts were not in full accord on all points, there was ample testimony from which a jury could find that there existed no disabling malfunction at the time of the homicide under the established rules for determination of criminal responsibility.[15]
Among the other points urged by appellant are objections to comments by court and counsel in the course of trial before the jury; objections to latitude permitted in cross examination of appellant; and alleged error in submitting the form of verdict "not guilty by reason of insanity" upon the plea of temporary insanity entered in the cause. We conclude from an exhaustive consideration of the record in these respects that no prejudicial error was committed.
The objections to "hearsay" are apparently based upon the court's alleged error in admitting into evidence a memorandum made by a witness for the prosecution, Mrs. Edna Leonard, in the course of her business employment by a baby-sitting agency. Her testimony was simply that on a specified date she had occasion to make a record of a call for a baby-sitter, and (it was only upon cross examination that the caller was identified as a man) there appeared upon the face of the note the name "A.H. Bibby," a street address which was that of defendant, and the name "Mrs. Ellen Osteen," together with the name "La Motte" subsequently identified as the sitter sent on this *696 job. Mrs. La Motte then testified that she was sent on the date in question to the specified address to baby-sit for a Mrs. Osteen, and that the woman who admitted her, and employed her to remain with a child during her absence with a man until 5:00 a.m., was the defendant.
The testimony in this regard was clearly within the scope of rebuttal to defendant's line of defense in general, and her statements in particular that she did nothing to contribute to the deterioration of her marital relationship, that "all I wanted to do is go live with him. * * * All I did was wait for him. * * *" Evidence for the defense was directed to showing a course of events affecting the marital relationship and producing in defendant such a state of mind as to relieve her from criminal responsibility for her acts. In this situation evidence of other events vitally affecting the marital relation, and bearing upon her alleged state of mind, was properly admitted in impeachment. The collateral issue as to use of fictitious names arose unavoidably in the course of the witnesses' report of the incident, and the disputed memorandum did not put before the jury any material information other than that contained in other admissible testimony.
Assuming without conceding any merit in the remaining contentions, that the instructions did not specifically cover evidence of a prior conviction, and that there was error in qualifying a juror who was under prosecution for a federal offense, these cannot avail the appellant in this case who, having full knowledge or notice in both instances, failed to object or raise an issue in a proper and seasonable fashion.[16] Moreover there is no showing, or assertion, that under the circumstances any actual bias resulted.
Affirmed.
TERRELL, ROBERTS, THORNAL and O'CONNELL, JJ., concur.
THOMAS, C.J., and HOBSON, J., concur in part and dissent in part.
HOBSON, Justice (concurring in part and dissenting in part).
Although I agree with that portion of the majority opinion which holds that F.S. § 40.01(1), F.S.A., is valid and constitutional, I cannot agree with the judgment of affirmance because of my belief that harmful and, therefore, reversible error has been clearly demonstrated.
The facts delineated in the majority opinion are accurate, but do not, as I see it, limn the true picture painted by the entire record of the testimony. The following facts appear to be undisputed:
Appellant, Gwendolyn Hoyt, was tried and convicted for the second degree murder of her husband by hitting him over the head with a baseball bat. The deceased was an Air Force Captain. He and appellant were married a number of years and had an eight year old son. They had been divorced once some twelve years ago and remarried. The deceased had for some time been unfaithful to his wife. Appellant has had epilepsy since age 20 (she is now 33 years old). This epilepsy has resulted in rather severe permanent damage to the temporal and parietal lobes of the left side of her brain. This portion of the brain is that which largely controls one's emotions. This damage becomes more apparent when appellant is under severe emotional tension or stress. All of which was known to the deceased.
Approximately a year and a half prior to the homicide, deceased was transferred from Macdill Field in Tampa to Homestead Air Force Base south of Miami. Appellant wanted to move, with their son, to Homestead *697 to be with or near her husband. For the first eight or nine months the deceased spent every weekend and all his leave time in Tampa with his wife and son.
In the early part of 1957, the deceased suddenly changed his habits and began cutting his weekend visits short, failing to come home during his leaves, receiving strange telephone calls while at home, coming home with lipstick on his shirt, washing his clothes immediately upon arrival at home, even at 3 or 4 o'clock in the morning, and doing other acts which were understandably upsetting to appellant. Appellant pleaded with deceased to let her and their son move to Homestead, but to no avail. She drove to Homestead twice during July and August to implore deceased to move her and their son down there, and both times he promised to do so but failed to keep his promise either time, although his conduct continued as before.
The appellant last heard from deceased, prior to the day of the homicide, on September 6th. She attempted repeatedly to contact him by telephone without success, and finally sent word on September 18th that their son was dying, which was untrue. Appellant testified she hoped this would bring her husband home. The deceased came home on September 19th, and the appellant did everything in her power during that day to make him happy and to reconcile any differences they might have had. That night she dressed in a sheer nightgown for the obvious purpose of creating a love-making atmosphere in which they could discuss their differences. However, the deceased spurned his wife, seized a pillow and lay down on the couch in the living room, refusing to discuss any problems with her.
Earlier that day a broken baseball bat had been brought by their boy from the yard into the house. Appellant decided to carry the splintered bat to the garbage can. At this juncture because of her husband's sudden, complete and final rejection of her efforts toward revitalizing the marriage, she became emotionally upset, as would forsooth even a normally stable wife under such circumstances. The record clearly shows Mrs. Hoyt was far from "normally stable", indeed she was, at least, neurotic if not psychotic.
The oft repeated quotation "Heaven has no rage like love to hatred turned, Nor hell a fury like a woman scorned" has been accepted as apodictic throughout the ages. In her distraught condition appellant struck deceased numerous blows upon his head, inflicting injuries from which he died the next day. Thereafter appellant had to be kept in the psychiatric ward of Tampa General Hospital for almost two weeks.
Appellant raises several questions. She invokes the jurisdiction of this court, attacking the constitutionality of that portion of Section 40.01(1), Florida Statutes, F.S.A., which provides that:
"* * * no female person shall be taken for jury service unless said person has registered with the clerk of the circuit court her desire to be placed on the jury list."
The trial court ruled directly that the statute was constitutional, and appellant is properly before this court.
There is one error assigned which I think without doubt requires the reversal of the judgment of the lower court. Appellant went out on a date with a man about one week prior to the homicide and did not return to her home until the wee hours of the morning. This man, out of the presence of appellant, calling a babysitting agency and ordered a baby sitter sent to appellant's house to stay with appellant's young son. He also, and without appellant's knowledge, gave the agency a false name for appellant. The trial court, over objection of defense counsel, permitted the state to question appellant about this date and to produce the purely hearsay testimony of the ladies of the babysitting agency as to their conversations with the man and with each other as to the false name. This testimony had the sole and devastating effect *698 of, at least, permitting the jury to infer that appellant was a woman of bad character, a prevaricator and equally as guilty as was her husband of infidelity, although her character was never placed in issue. The man was not called to testify. I can only reach the conclusion that this testimony was intended by the county solicitor to prejudice the jury against her, and it may well have had such effect.
Although it is suggested that this cross-examination was in rebuttal of the defendant's testimony in and by which she depicted her husband as a flagrant philanderer, it does not occur to me that this was proper rebuttal but was nothing more nor less than recrimination.
The law in this state upon this subject is in accord with all other jurisdictions. We said in Mann v. State, Fla. 1886, 22 Fla. 600, 606, 607:
"`Proceeding then to consider what has been settled in this matter, I think we may state the law in the following propositions:
"`1. It is not permitted to the prosecution to attack the character of the prisoner, unless he first puts that in issue by offering evidence of his good character.
"`2. It is not permitted to show the defendant's bad character by showing particular acts.
"`3. It is not permitted to show in the prisoner a tendency or disposition to commit the crime with which he is charged.
"`4. It is not permitted to give in evidence other crimes of the prisoner, unless they are so connected by circumstances with the particular crime in issue as that the proof of one fact with its circumstances has some bearing upon the issue or trial other than such as is expressed in the foregoing three propositions.
* * * * * *
"`It is quite inconsistent with that fairness of trial to which every man is entitled that the jury should be prejudiced against him by any evidence except what relates to the issue; above all, should it not be permitted to blacken his character to show that he is worthless, to lighten the sense of responsibility which rests upon the jury, by showing that he is not worthy of painstaking and care.'"
And in Jordan v. State, 1932, 107 Fla. 333, 144 So. 669, 670, we stated:
"It is only permitted to interrogate witnesses as to previous convictions, not mere former arrests or accusations, for crime. The defendant as a witness in his own behalf, while subject to legitimate cross-examination, just as is any other witness, does not lose his status or character as a defendant on trial, whose character or reputation it is not permitted to the prosecution to attack, under the guise of a pretended questioning on cross-examination, the principal effect of which is calculated to be an attack on character or reputation of the accused as such, so as to induce a more ready belief that he is guilty of the charge on which he is being tried."
In my judgment the majority opinion has repudiated and receded from the rule of law announced in the above quoted cases, without expressly saying so.
In this case, even though the defendant's character was not in issue, the prosecutor was permitted to question the defendant about her conduct on one occasion. Such questioning was obviously intended to inflame and prejudice the jury. Further, the conduct of the defendant did not even amount to an offense, let alone a conviction, and was totally unconnected with the offense charged. The prosecutor was also permitted to introduce hearsay testimony, and hearsay testimony twice removed, which would indicate that appellant had used a false or assumed name for an ulterior *699 purpose wholly unrelated to the offense charged. A conviction based thereon cannot stand.
Appellant further contends that the jury list was improperly made. The facts show that the two jury commissioners for Hillsborough County used a lady clerk, assigned to them by the Clerk of the Circuit Court, to help prepare the list of names of persons to be placed in the jury box. A jury commissioner, as well as the young lady, testified that she selected the names for the jury list from the city directory and other sources and submitted the tentative list of names to the jury commissioners, who divided the list in half and each checked only one-half the names on the list. The list was then submitted to the circuit judges and thereafter prepared in final form and placed in the box.
Thus, it is seen that the jury commissioners did not select the names to go in the box, nor did they each affirm the entire list. Assuming arguendo that confirmation is sufficient, it is quite evident that such affirmation was not of the entire list but only one-half of such list by each commissioner.
The two jury commissioners for Hillsborough County, appointed by the Governor, have a single statutory duty, and that is to personally and in concert, exercise their discretion in selecting the names of persons to be placed in the box for jury duty. This they plainly did not do.
The law on this subject is as we stated in Chance v. State, 1934, 115 Fla. 379, 155 So. 663, 664:
"The county commissioners who are authorized to make selections of qualified persons for jury duty `cannot delegate that duty to any other person, but must themselves make the selection, and they cannot by subsequently ratifying a selection made by some other person render the selection valid. Moreover, the selection must be made by the board as a whole, and not as individuals.' 35 C.J. 262."
See also State ex rel. Jackson v. Jordan, 1931, 101 Fla. 616, 135 So. 138. This is the general law prevailing in all jurisdictions, and I can find no authority to the contrary, nor has the majority opinion cited any.
I have not overlooked the contention of the State that in the case of Chance v. State, 1934, 115 Fla. 379, 155 So. 663, we were dealing with Section 4444 (2772) Compiled General Laws when we ruled that the county commissioners were required personally to select and make out a list of the persons who were to serve as jurors and that said law has been amended by adding thereto the sentence:
"The clerk of the circuit court shall furnish or cause to be furnished the necessary clerical aid to the commission."
The legislature is presumed to understand, and to know how to express itself by use of, the English language and had that body intended that the "clerical aid", prescribed by the last sentence of Section 40.10, Florida Statutes, F.S.A., should perform the duties of the jury commissioners it could, should and would have said so. This the legislature did not do. It simply provided for "necessary clerical aid" but certainly did not grant to such person or persons the power to function in the place and stead of the jury commissioners. Moreover, as aforestated, the jury commissioners did not personally and individually examine or ratify the full list of jurors prepared by their "clerical aid" but each inspected only one-half of such list. It is crystal clear that the jury commissioners did not personally prepare the jury list. It may be true that the young lady  the clerical assistant  was present and took part "in the solemn duty of selecting names for jury lists" but it is even more certain that she, rather than the jury commissioners, actually prepared the jury list.
It is my opinion that our decision in the case of Chance v. State, supra, is applicable *700 to Section 40.10, Florida Statutes, F.S.A., and controlling herein.
For the reasons above stated, I respectfully dissent from the majority opinion.
THOMAS, C.J., concurs.

On Petition for Rehearing
PER CURIAM.
On consideration of the Petition for Rehearing filed by Attorneys for Appellant,
It is ordered by the Court that the said petition be, and the same is hereby, denied.
TERRELL, ROBERTS, DREW, THORNAL and O'CONNELL, JJ., concur.
THOMAS, C.J., Dissents.
HOBSON, J., dissents with opinion.

On Petition for Rehearing
HOBSON, Judge (dissenting).
Upon a reconsideration of this case on petition for rehearing, I have concluded that the portion of Section 40.01(1), Florida Statutes, F.S.A., which limits female jury duty to volunteers is unconstitutional. It places an undue burden upon women who otherwise are qualified for jury service which is not demanded of others so situated.
The question how can Gwendolyn Hoyt (appellant herein) complain, naturally arises. The answer is simple. She was accused of having committed a felony and, as will be demonstrated hereinafter, she had only a slight chance of securing even one of her own sex to sit in judgment upon her. She was not confronted by a jury of her peers  no member of the jury was in the feminine category.
No one in this enlightened age would question the fact that if a limitation such as is placed upon women by our statute with reference to jury service were engrafted into our statutory law in regard to some of the so-called minority groups comprising our citizenry, it would be stricken down as violative of constitutional guarantees of due process and equal protection of the law.
It might be said that if all persons eligible to sit as jurors would be called to perform such duty only upon volunteering, that such an act would be constitutional. However, the situation thus developed would be gauche, as well as impracticable. As a presiding judge of one of the highest nisi prius courts in this state for more than twenty years, I learned that those who seek to be excused from jury service are, generally speaking, the best qualified to perform such duty. If volunteering were a prerequisite for jury duty we would have only those persons who might be described as professional jurors  individuals who might be interested in the outcome of a given case or who, with nothing else to do, would have their attention directed toward the few dollars which are provided by law for such service.
Trial by a jury of one's peers may not be the best method of deciding questions of personal liberty or of property rights which could be envisaged, but until the minds of a free people develop a better system it must be held inviolate and protected at every turn. No valid reason exists for limiting jury service to women who volunteer. Trial judges have the same broad discretion to excuse women with pressing duties at home as to excuse men with pressing business commitments. Moreover, since the advent of woman suffrage and the entry, in this era of modernity, of untold numbers of American women into all fields of business and professional life, the *701 reason given[1] for excluding them from jury service no longer exists, nor does that or any other reasonable basis which I can envisage exist to justify the provision of our statute limiting female jury duty to volunteers.
It would appear, from the opinion of the majority, that jury trial is a privilege which may be limited or discarded by the legislature. Such is not the case where criminal trials are involved. The founders of this nation were so disturbed by abuses of the sovereign in this respect that the right to trial by jury was guaranteed to all defendants in criminal cases (6th Amendment, U.S. Constitution), and our own Constitution adopted this guarantee as a part of our Declaration of Rights (Section 11, Florida Constitution, F.S.A.).
Here, under the statute, the names of only ten women were included among the 10,000 names placed in the jury box in 1956, and none were among the 2,500 names added to the box in 1957 because none were drawn out during the entire year 1956. Thus, while .40 or 40% of the qualified jurors in the county were women, only .001 or one-tenth of 1% of the names placed in the jury box were women.
There can be no question that women as a class have been discriminated against by the statutory limitation.
The majority suggests that, while administrative discrimination is unconstitutional, legislative discrimination is not, and quotes a passage from Hernandez v. State of Texas, 1953, 347 U.S. 475, 74 S.Ct. 667, 670, 98 L.Ed. 866, purporting to support this view. In fact, Hernandez v. State of Texas, supra, constitutes the most recent authority for the opposite conclusion. There the U.S. Supreme Court held, in a case involving discrimination against persons of Mexican descent for jury service, that when any distinct class in the community is singled out by the State, for different treatment not based upon some reasonable classification, "whether acting through its legislature, its courts, or its executive or administrative officers" then "the guarantees of the Constitution have been violated."
Again, the majority opinion states that since "some" women might be called for jury service under the statutory system, there is no unconstitutional exclusion of "all" women. In Thiel v. Southern Pacific Company, 1945, 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181, 166 A.L.R. 1412, the U.S. Supreme Court held that the exclusion of a distinct and substantial class in the community (in that case daily wageearners) "either in whole or in part" could not be tolerated.[2] Indeed, in Hernandez v. State of Texas, supra, Mexicans were not entirely excluded from jury service.
In our statute under attack the legislature has qualified women as fully as men for jury service and then restricted their eligibility to serve to only those women who volunteer, a restriction not placed upon men. There is no reasonable basis for this classification of a class (nonvolunteers) within a class (women).
Of the cases cited in the majority opinion, all support this view except Fay v. People of State of New York, 1946, 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043. There, no discrimination against women was found under the facts, and actually, some women were called in that case for jury duty, and one served on the jury. Here, the discrimination is patent on the face of the statute.
I approve and would follow the decision in Ballard v. United States, 1946, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181.[3]
Concluding this point, it seems to me that if the present restriction upon female *702 jury service were constitutional, then we must hold that the legislature could validly require all women to serve but limit male service to volunteers and thus, in effect, create an all female jury system. At least this presents the test of the present restriction.
I would find that portion of Chapter 40.01(1), Florida Statutes, F.S.A., which reads as follows:
"provided, however, that the name of no female person shall be taken for jury service unless said person has registered with the clerk of the circuit court her desire to be placed on the jury list,"
unconstitutional and in conflict with the "impartial jury trial" guarantees of both the Florida and Federal Constitutions and the "equal protection of the law" provision of the Federal Constitution, Amend. 14.
For the reasons above stated, I would grant the petition for rehearing.
NOTES
[1] "40.01 Qualifications and disqualifications of jurors

"(1) Grand and petit jurors shall be taken from the male and female persons over the age of twenty-one years, who are citizens of this state, and who have resided in the state for one year and in their respective counties for six months, and who are duly qualified electors of their respective counties; provided, however, that the name of no female person shall be taken for jury service unless said person has registered with the clerk of the circuit court her desire to be placed on the jury list."
[2] Art. V. Sec. 4(b), Constitution of the State of Florida, F.S.A.; Rule 2.1a(5) (a), Fla.Rules of Appellate Procedure, 31 F.S.A.
[3] Ballard v. United States, 329 U.S. 187, 67 S.Ct. 261, 264, 91 L.Ed. 181; Annotation 166 A.L.R. 1422.
[4] Hernandez v. State of Texas, 347 U.S. 475, 74 S.Ct. 667, 670, 98 L.Ed. 866; Thiel v. Southern Pacific Company, 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181.
[5] Hernandez v. State of Texas, ibid.
[6] Strauder v. West Virginia, 100 U.S. 303, 25 L.Ed. 664. Fay v. People of State of New York, 332 U.S. 261, 67 S.Ct. 1613, 91 L.Ed. 2043.
[7] Hall v. State, 136 Fla. 644, 187 So. 392; Bacom v. State, Fla., 39 So.2d 794; Annotation 157 A.L.R. 461.
[8] See note (1) supra.
[9] See Thiel v. Southern Pacific Company, 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181.
[10] Cf. Chance v. State, 115 Fla. 379, 155 So. 663, construing Sec. 4444, C.G.L. 1927.
[11] Ibid., 155 So. at page 664.
[12] 50 C.J.S. Juries § 158, p. 882; cases collected 92 A.L.R. 1109, 1112.
[13] State ex rel. Jackson v. Jordan, 101 Fla. 616, 135 So. 138. Cf. State v. Walters, 61 Idaho 341, 102 P.2d 284.
[14] See Warner v. State, Fla., 84 So.2d 314.
[15] Ibid.
[16] F.S. Sec. 918.10(4), F.S.A. Brunke v. State, 160 Fla. 43, 33 So.2d 226. See also Ex parte Sullivan, 155 Fla. 111, 19 So.2d 611.
[1] Women are primarily homemakers and should not be diverted from their duties as such.
[2] Here court discussed discretion of the trial judge to excuse in individual cases.
[3] See 31 Am.Jur. 617 and 166 A.L.R. 1422.